**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

| | |
|---|---|
| DEWAYNE JOHNSON, | Civil Action No.: |
| Plaintiff, | |
| v. | 7:21-cv-00126 |
| UNITED PARCEL SERVICE, INC., | |
| Defendant. | **JURY TRIAL DEMANDED** |

<u>**COMPLAINT**</u>

COMES NOW Plaintiff Dewayne Johnson and brings this action pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.*, and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*, as amended.  Plaintiff alleges that Defendant United Parcel Service, Inc. subjected Plaintiff to discrimination based on age as well as disability and/or perceived disability, including by subjecting Plaintiff to unlawful medical inquiries and examinations, resulting in Plaintiff's constructive termination, respectfully showing the Court as follows:

**JURISDICTION AND VENUE**

1.

This Court has original jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. §§ 1331 & 1343 and the enforcement provisions of the Age Discrimination in Employment Act and the Americans with Disabilities Act.

2.

Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Plaintiff was employed, and the events underlying this action occurred, in Tift County, Georgia, which is located within this judicial district.

## PARTIES

3.

Plaintiff Dewayne Johnson (hereinafter, "Plaintiff" or "Brown") is a citizen of the United States and a resident of Georgia.  At all times relevant to this suit, Mr. Johnson was employed with Defendant United Parcel Service, Inc.

4.

At all relevant times, Mr. Johnson was considered a covered, non-exempt employee under the Age Discrimination in Employment Act and the Americans with Disabilities Act.

5.

Defendant United Parcel Service, Inc. (hereinafter, "Defendant") is a foreign profit corporation incorporated under the laws of the State of Ohio and authorized to do business in the State of Georgia.  Defendant principal place of business is located at 55 Glenlake Parkway Northeast, Atlanta, Fulton County, Georgia 30328.  Defendant may be served with may be served with process by delivering a copy of the Summons and Complaint to its Registered Agent, CSC of Cobb County, Inc., located at 192 Anderson Street Southeast, Suite 125, Marietta, Cobb County, Georgia 30060.

6.

Defendant is a multi-national package delivery and supply chain management company. Defendant is engaged in interstate commerce, has annual revenue in excess of $500,000.00, and has employed in excess of 500 individuals in the year 2021 and in prior calendar years.

7.

At all relevant times, Defendant was considered a covered employer under the Age Discrimination in Employment Act and the Americans with Disabilities Act.

**STATEMENT OF FACTS**

8.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 7, as if the same were set forth herein.

9.

Mr. Johnson was born in 1961, and he was age 59 in December 2020.

10.

Mr. Johnson began his employment with Defendant beginning in August 1980.

11.

For a continuous period of approximately 495 months, Mr. Johnson served as one of Defendant's drivers of Fleet Trucks, where he was based most recently at Defendant's Tifton, Georgia Distribution Center.

12.

Mr. Johnson's performance over his uninterrupted forty (40) year tenure with Defendant was always exemplary.

13.

Indeed, there was a recent situation where Mr. Johnson missed a turn while traveling to Defendant's new Pleasantdale SMART Hub.  However, it not uncommon for drivers of all ages and levels of experience to get lost from time-to-time.

14.

As is standard for Defendant, Mr. Johnson did not experience any consequences for this mistake.

15.

Despite the fact that Mr. Johnson had already been completely vested in Defendant's retirement plan, he really enjoyed working for Defendant and planned to continue for several more years.

16.

Neither Defendant, nor any applicable state or federal agencies, have any policies or regulations mandating an age of retirement for drivers of these large commercial vehicles.

17.

Generally, Mr. Johnson was known by his coworkers to be a friendly and jovial person. However, recently, he had been engaged in a business dispute with a member of his immediate family that is entirely unrelated to Defendant.  While this has weighed on Mr. Johnson personally and he has not been his normal "bubbly" self, he continued to perform his duties and his work was in no way impacted by this personal issue.

18.

A small number of Mr. Johnson's close coworkers and supervisors checked in with Mr. Johnson to see if he was alright, and Mr. Johnson provided them with a general idea of what had been going on.

19.

However, Mr. Johnson's coworkers never questioned him about his mental capacity or function.

20.

Mr. Johnson had taken a few days off from work, and he returned to work on the morning of November 2, 2020.

21.

As soon as he arrived to work on November 2, 2020, Mr. Johnson was summoned to immediately report to the office.  When he arrived, he asked what the meeting was about, and he was told to have a seat.

22.

Center Manager Lavelle Mason (hereinafter, "Center Mgr. Mason") then told Mr. Johnson that they (i.e., Mr. Johnson's supervisor, a union representative, a witness, and Mason) just wanted to talk to him.  Center Mgr. Mason also mentioned that he was worried about Mr. Johnson and said that he had not been acting himself. Mr. Johnson explained, once again, that the litigation with his family member had been causing him some stress, but Mr. Johnson assured the others that he was alright.

23.

In response, Center Mgr. Mason said that, because Mr. Johnson was not acting himself, he had to be "checked out."

24.

Another individual in this meeting then made a remark about Mr. Johnson suffering from memory loss.

25.

This comment surprised Mr. Johnson, who immediately denied experiencing any loss to his memory and explained that he just had a lot going on at home.

26.

With that, the meeting was over, and Mr. Johnson's immediate supervisor directed him to go back to his personal vehicle, and then follow the supervisor to a nearby, off-site medical clinic.

27.

This off-site medical clinic is one that Defendant often uses for its employees.

28.

Mr. Johnson did not believe that he had a choice about going to the medical clinic, and he felt that he would be terminated if he refused to go.

29.

Mr. Johnson complied with his supervisor's directive, and he followed the vehicle to the medical clinic.

30.

When Mr. Johnson entered the medical clinic, the providers were already expecting him.

31.

Defendant had apparently already made arrangements for the appointment without Mr. Johnson's knowledge or consent.

32.

Once the appointment began, the doctor explained that memory loss could be the result of a hormone imbalance.

33.

Based on the doctor's theory, the medical providers proceed with an invasive medical examination, including performing an electrocardiogram ("EKG") and they drew Mr. Johnson's blood.

34.

This was the first time in his approximately 40-year tenure that Mr. Johnson had never been subjected to an examination such as this.

35.

Mr. Johnson also had not been aware of any of Defendant's younger drivers, or any other employees for that matter, being subjected to such invasive testing.

36.

Similarly, Mr. Johnson was familiar with Department of Transportation physicals and Federal Motor Carrier Safety Administration Fitness for Duty exams, neither of which had ever required for him to be subjected to a blood test or EKG.

37.

According to the agreement between Mr. Johnson's union and Defendant, Defendant is only allowed to subject its employees to one physical, mental, or other examination per year, unless the employee has suffered a serious injury or illness.

38.

Mr. Johnson had not suffered any serious injury or illness at that time.

39.

According to the agreement between Mr. Johnson's union and Defendant, Defendant is required to provide employees with reasonable, advanced notice of examinations.

40.

Defendant failed to give Mr. Johnson *any* advanced notice of this examination.

41.

After the examination was completed and Mr. Johnson left the building, he spoke to his supervisor in the parking lot.

42.

The medical providers had said that the blood test results were going to take several days, and for this reason, Mr. Johnson's supervisor told him that he should take the remainder of the week off of work and go fishing or hunting. The supervisor told Mr. Johnson that his time off would be paid.

43.

Mr. Johnson complied with his supervisor's directive, and he went home.

44.

Soon thereafter, while he was on leave, one of Mr. Johnson's coworkers called to check on him.  In this conversation, Mr. Johnson learned that another coworker, Randy Turner, had been telling other people in the workplace that Mr. Johnson was suffering from dementia.

45.

Mr. Johnson was not suffering from dementia.

46.

Mr. Johnson did not appear to be suffering from dementia.

47.

Mr. Johnson had not told Mr. Turner that he was suffering from dementia.

48.

Mr. Johnson later learned that it had apparently been a member of his extended family who falsely told Mr. Turner this information.

49.

This relative of Mr. Johnson also happened to be involved in the aforementioned litigation, and it would appear that the false information was told to Mr. Turner in an attempt to injure Mr. Johnson.

50.

During the same conversation with his coworker, which occurred only a day or two into Mr. Johnson's leave, Mr. Johnson learned that his supervisor had already reassigned his truck, apparently on a permanent basis, to another employee.

51.

Mr. Johnson also found out that he was not get paid over the last several days as he had been told he would.

52.

When he followed up with his supervisor, Mr. Johnson was told that he could either take unpaid leave or he could work in the warehouse as a porter, one of Defendant's employees who cleans and organizes the floor of the distribution center.

53.

At no point during the approximately 14,000 days that he had been employed with Defendant had Mr. Johnson ever worked, or been asked to work, as a porter.

54.

Mr. Johnson received the result of his medical exam and blood test soon thereafter.

55.

As he had expected, the results of the exam showed that there was nothing wrong with him or reason to think that he was experiencing memory loss or dementia.

56.

However, based on how he had been treated by Defendant, Mr. Johnson had become so concerned for his own health that he obtained a magnetic resonance imagining ("MRI") scan.

57.

When Mr. Johnson got his MRI results, nothing was abnormal.

58.

Mr. Johnson waited for several weeks for Defendant to invite him back to work as he had been assured.

59.

Unfortunately, the call for Mr. Johnson to return to his job never came.

60.

During that time, Mr. Johnson did hear from several other coworkers, who told him that other employees had been frequently discussing Mr. Johnson's supposed mental incapacity at work.

61.

Mr. Johnson's coworkers also told him that his supervisors had been asking other employees about Mr. Johnson's memory and demeanor, without his knowledge, for months.

62.

Based on the conversation that Mr. Johnson had with his coworker on November 3rd or 4th concerning the reassignment of his truck to another employee, it was Mr. Johnson's belief that Defendant had removed him from his position.

63.

Mr. Johnson also felt angry, humiliated, and embarrassed, knowing that his coworker had been spreading rumors about his purported dementia in the workplace.

64.

Based on the early November 2020 call, in which Mr. Johnson's supervisor told him that he could return to work as a warehouse porter, Mr. Johnson's belief that he was being removed as a driver for Defendant was confirmed.

65.

Mr. Johnson's supervisor's suggestion that he could remain on unpaid leave, along with his discovery that he was not being paid for his time off, despite what he had previously been told

by his supervisor on November 2, 2020, made Mr. Johnson question at that time whether he was still even employed.

66.

The fact that, by November 21, 2020, several weeks into Mr. Johnson's leave and after he received the result of the medical exam, he had still not been invited back to work confirmed Mr. Johnson's belief that he was no longer employed.

67.

Moreover, Mr. Johnson was very hurt and offended knowing that his coworkers were continuing to discuss Mr. Johnson's purported memory issues during his leave along with the fact that his supervisors had been asking his coworkers about his memory and demeanor for months.

68.

Despite Mr. Johnson's intention to continuing driving for Defendant for several more years, as a result of the foregoing, Mr. Johnson felt as though he had no other choice but to submit his retirement on November 21, 2020.

69.

Over six months after the examination, in a statement that Defendant provided through counsel in the underlying administrative proceeding, Defendant stated "UPS has no knowledge of the results of the examination."

70.

This suggests that Defendant's reasons requiring Mr. Johnson to be examined were pretext for attempting to remove Mr. Johnson from his position or his employment all together.

Procedural/Administrative Background

71.

On or about January 25, 2021, Mr. Johnson submitted his Charge of Discrimination to the Equal Employment Opportunity Commission (hereinafter, "EEOC"), alleging that he had been subjected to discrimination based on age in violation of the Age Discrimination in Employment Act and disability and/or perceived disability in violation of the Americans with Disabilities Act. The EEOC assigned Mr. Johnson Charge Number 410-2021-02875.

72.

Defendant had notice of Mr. Johnson's Charge of Discrimination, participated in the proceedings before the EEOC, and was represented by counsel during said proceedings.

73.

The EEOC subsequently issued a Notice of Right to Sue, which Mr. Johnson received, through counsel, on August 29, 2022.  A notification concerning the Notice was sent to Mr. Johnson, through counsel, via email on August 26, 2022; however, Mr. Johnson was unable to access a copy of the actual Notice at that time.  The Notice of Right to Sue is dated August 18, 2022.

74.

Mr. Johnson has exhausted his administrative remedies as to her first Charge of Discrimination, and he is filing the instant action within ninety days of the EEOC's issuance and her receipt of a Dismissal and Notice of Rights.

**COUNT I:**
**DISCRIMINATION BASED ON AGE**
**IN VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT**

75.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 74, as if the same were set forth herein.

76.

Pursuant to the Age Discrimination in Employment Act, it is unlawful for an employer to discriminate against any individual with respect to the compensation, terms, conditions, or privileges of his or her employment because of such individual's age. 29 U.S.C. § 623.

77.

As alleged herein, Plaintiff is a covered employee under the Age Discrimination in Employment Act, and Defendant is considered covered employer under the same. *See* 29 U.S.C. § 630.

78.

Plaintiff was between the ages of forty and seventy at all times relevant to the facts of this Complaint.

79.

As alleged herein, Plaintiff was qualified for, and satisfactorily performed the essential functions of, his position with Defendants for a period of approximately forty years.

80.

On or about November 2, 2020, Defendant subjected Plaintiff to an invasive medical examination, for the purposes of testing for dementia and/or other mental incapacity, solely on account of Plaintiff's age.

81.

On or about November 2, 2020, Defendant forced Plaintiff on unpaid leave and refused to allow him to return to work, solely because of his age.

82.

After placing Plaintiff on unpaid leave, Defendant replaced Plaintiff with an employee who was substantially younger, even though such person was less qualified that Plaintiff.

83.

By November 21, 2020, Defendant constructively terminated Plaintiff's employment solely on account of his age.

84.

As alleged herein, and as a result of the foregoing, Plaintiff was treated less favorably than his coworkers who were younger than him, in that Plaintiff's younger, similarly-situated coworkers were not subjected to any of the same treatment by Defendant.

85.

Defendant will be unable to present any evidence of a legitimate, nondiscriminatory motive for the conduct alleged herein.

86.

Plaintiff will prove that the Defendants' stated reasons are pretextual, were willful and indeed motivated by Plaintiff's age.

87.

Plaintiff has been injured by Defendants' discrimination based on age, and he is entitled to all damages allowed under the Age Discrimination in Employment Act, including back pay

including fringe benefits, front pay or reinstatement, injunctive relief, liquidated damages, and attorney's fees and costs of litigation, all in an amount to be proven at trial.

## COUNT II:
## IMPROPER MEDICAL EXAMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

88.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 74, as if the same were set forth herein.

89.

The Americans with Disabilities Act prohibits covered entities from "discriminating against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

90.

Additionally, the ADA prohibits employers from requiring a medical examination of an employee unless such examination is shown to be job-related and consistent with business activity. 42 U.S.C. ¶ 12112(d).

91.

As alleged herein, Defendant and Plaintiff are a covered, nonexempt employer and non-exempt employee under the ADA, respectively. See 42 U.S.C. § 12111.

92.

As alleged herein, Plaintiff was qualified for, and satisfactorily performed the essential functions of, his position with Defendants for a period of approximately forty years.

93.

As alleged herein, Plaintiff was perceived by Defendant as having a disability, that substantially limits a number of major life activities, particularly, dementia and/or some other condition that results in memory loss.

94.

On or around November 2, 2020, Defendant forced Plaintiff to undergo a medical evaluation, in violation of the applicable union agreement and without any valid basis to do.

95.

As alleged herein, Plaintiff underwent the medical evaluation because he felt as though he did not have any other choice and that his job would be in jeopardy if he refused to do so.

96.

Defendant's requirement for Plaintiff to undergo a medical evaluation had no relation to Plaintiff's job or her performance.

97.

Defendant's requirement for Plaintiff to undergo a medical evaluation was not consistent with any of Defendant's business activities.

98.

As a result, Defendant subjected Plaintiff to a prohibited medical examination.

99.

Plaintiff has been injured by Defendant requiring him to undergo a prohibited medical examination, and Plaintiff is entitled to all damages allowed under the Americans with Disabilities Act, including back pay, reinstatement or front pay, compensatory punitive damages of not less

than $300,000.00, or such other amount permitted by statute, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

**COUNT III:**
**DISCRIMINATION BASED ON DISABILITY IN VIOLATION OF**
**THE AMERICANS WITH DISABILITIES ACT**

100.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 74, as if the same were set forth herein.

101.

The Americans with Disabilities Act prohibits covered entities from "discriminating against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

102.

As alleged herein, Defendant and Plaintiff are a covered, nonexempt employer and non-exempt employee under the ADA, respectively. See 42 U.S.C. § 12111.

103.

As alleged herein, Plaintiff was qualified for, and satisfactorily performed the essential functions of, his position with Defendants for a period of approximately forty years.

104.

As alleged herein, Plaintiff was perceived by Defendant as having a disability, that substantially limits a number of major life activities, particularly, dementia and/or some other condition that results in memory loss.

105.

On or about November 2, 2020, Defendant subjected Plaintiff to an invasive medical examination, for the purposes of testing for dementia and/or other mental incapacity, solely on account of Plaintiff's disability and/or perceived disability.

106.

On or about November 2, 2020, Defendant forced Plaintiff on unpaid leave and refused to allow him to return to work, solely because of his disability and/or perceived disability.

107.

After placing Plaintiff on unpaid leave, Defendant replaced Plaintiff with an employee who does not have a disability and/or perceived disability, even though such person was less qualified that Plaintiff.

108.

By November 21, 2020, Defendant constructively terminated Plaintiff's employment solely on account of his disability and/or perceived disability.

109.

As alleged herein, and as a result of the foregoing, Plaintiff was treated less favorably than his coworkers without a disability and/or perceived disability, in that Plaintiff's similarly-situated coworkers were not subjected to any of the same treatment by Defendant.

110.

Defendant will be unable to present any evidence of a legitimate, nondiscriminatory motive for the conduct alleged herein.

111.

Plaintiff will prove that the Defendants' stated reasons are pretextual, were willful and indeed motivated by Plaintiff's disability and/or perceived disability.

112.

Plaintiff has been injured by Defendant's discrimination of Plaintiff due to his disability and/or perceived disability, and Plaintiff is entitled to all damages allowed under the Americans with Disabilities Act, including back pay, reinstatement or front pay, compensatory punitive damages of not less than $300,000.00, or such other amount permitted by statute, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dewayne Johnson respectfully prays for the following relief:

1) That Summons and Process be issued to Defendants United Parcel Service, Inc. and Timothy C. Ward, in his Official Capacity as Commissioner of the United Parcel Service, Inc., and that said Defendants be served as provided by law;

2) That this matter be tried before a jury;

3) That judgment be awarded for and in favor of Plaintiff and against Defendant United Parcel Service, Inc. on Count I for discrimination based on age, and grant Plaintiff all relief allowable under the Age Discrimination in Employment Act;

4) That judgment be awarded for and in favor of Plaintiff and against Defendant United Parcel Service, Inc. on Count II for discrimination based on disability and/or perceived

disability in the form of subjecting Plaintiff to an improper medical evaluation, and grant Plaintiff all relief allowable under the Americans with Disabilities Act;

5) That judgment be awarded for and in favor of Plaintiff and against Defendant United Parcel Service, Inc. on Count III for discrimination based on disability and/or perceived disability, and grant Plaintiff all relief allowable under the Americans with Disabilities Act; and,

6) For such other relief as this Court shall deem just and proper.

Respectfully submitted, this 16th day of November, 2022.

KENNETH E. BARTON III
Georgia Bar No. 301171
*Attorney for Plaintiff*

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007 telephone
(478) 841-9002 facsimile
keb@cooperbarton.com